# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| Frederick Burton, Individually<br>And On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>Merrill Lynch & Co., Inc. and Merrill Lynch,<br>Pierce, Fenner & Smith Inc.,<br><br>Defendants. | Case No. 1:08-cv-03037-LAP |
| Richard Stanton (as Trustee for Ashley<br>Stanton), On Behalf of All Others Similarly<br>Situated,<br><br>Plaintiff,<br><br>v.<br><br>Merrill Lynch & Co., Inc. and Merrill Lynch,<br>Pierce, Fenner & Smith Inc.,<br><br>Defendants. | Case No. 1:08-cv-03054-LAP |

**DECLARATION OF AARON M. SHEANIN IN SUPPORT OF THE
MOTION OF GERALD WENDEL AND ROBERT BERZIN FOR
APPOINTMENT AS LEAD PLAINTIFF AND APPROVAL OF
SELECTION OF COUNSEL**

I, Aaron M. Sheanin, under penalty of perjury, hereby declare:

1.      I am a partner of Girard Gibbs LLP and am admitted to practice *pro hac vice* in the above-captioned action.  I submit this declaration in support of the Motion Of Gerald Wendel And Robert Berzin For Consolidation Of Actions, Appointment As Lead Plaintiff, And Approval Of Selection of Counsel.

2.      Attached hereto as Exhibit A is a true and correct copy of an excerpt of a Merrill Lynch document entitled, "The Fixed Income Digest," dated February 1, 2008.

3.      Attached hereto as Exhibit B is a true and correct copy of a Merrill Lynch presentation entitled, "FAS 140:  QSPE Status of Certain Securitizations," prepared in November 2005 for a broker-dealer conference.

4.      Attached hereto as Exhibit C is a true and correct copy of the Declaration Of Gerald Wendel In Support Of The Motion Of Gerald Wendel And Robert Berzin For Appointment As Lead Plaintiff And Approval Of Selection Of Counsel.

5.      Attached hereto as Exhibit D is a true and correct copy of the Declaration Of Robert Berzin In Support Of The Motion Of Gerald Wendel And Robert Berzin For Appointment As Lead Plaintiff And Approval Of Selection Of Counsel.

6.      Attached hereto as Exhibit E is a true and correct copy of the opinion of the Honorable Coleen McMahon in *Bhojwani v. Pistiolis*, No. 06-13761 (S.D.N.Y. July 31, 2007).

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed this 13th day of June, 2008 at San Francisco, California.

     */s/ Aaron M. Sheanin*     
Aaron M. Sheanin

## CERTIFICATE OF SERVICE

I, Jonathan K. Levine, hereby certify that on June 13, 2008, I caused the following document(s) to be filed electronically with the United States District Court for the Southern District of New York through the Court's mandated ECF service:

1.     **DECLARATION OF AARON M. SHEANIN IN SUPPORT OF THE MOTION OF GERALD WENDEL AND ROBERT BERZIN FOR CONSOLIDATION OF ACTIONS, APPOINTMENT AS LEAD PLAINTIFF, AND APPROVAL OF SELECTION OF COUNSEL**

Counsel of record are required by the Court to be registered e-filers, and as such are automatically e-served with a copy of the document(s) upon confirmation of e-filing.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 13th day of June, 2008 at San Francisco, California.


            */S/ Jonathan K. Levine*

EXHIBIT A



**Merrill Lynch**
01 February 2008

The Fixed Income Digest

**Table 1: High-quality short term alternatives**

| Taxable | |
|---|---|
| CMA | 4.21% |
| 7 day auction market | 4.23% |
| 30 day auction market | 4.46% |
| 2-Yr Treasury | 2.06% |
| 2-Yr GSE | 2.57% |
| 2-Yr CD | 3.10% |
| | |
| **Tax-Exempt** | |
| CMA | 2.39% |
| 7 day auction market | 3.31% |
| 30 day auction market | 4.11% |
| 2-Yr Municipal | 2.20% |

Source: Merrill Lynch.

For investors who prefer not to extend that far in maturity, we suggest locking in rates on better yielding two- and three-year maturities. Doing so might involve some sacrifice in yield now, but we think that ultimately investors will wind up with better income.

Table 1 gives an idea of alternatives. In the taxable market, two-year CDs presently yield about 90 basis points less than where CMA funds are now, but much better than we expect CMA rates to be a few months from now. The comparison is similar for tax-exempt CMA rates and two-year municipals.

## For cash holdings: auction market securities

Naturally, most investors need to keep some portion of their portfolios in liquid, cash-like instruments. We find auction market securities (AMS) to be a better alternative than money funds for these purposes for investors with larger amounts to invest. The typical minimum investment in auction securities is $25,000. The minimum for Variable Rate Demand Obligations (VRDOs) in the muni market is $100,000.

As the Table shows, the rate on 30-day taxable AMS is 25 basis points higher than the taxable CMA rate. That spread is a narrower than normal, because, as we mentioned in the previous section, money market rates have not yet fully responded to the Fed rate cuts. The rate on 30-day tax-exempt AMS is 172 basis points higher than the tax-exempt CMS, which is a much wider spread than normal.

Auction market securities do not provide daily access to funds as money markets do, but they come close enough for many people. Investors can withdraw from AMS at the regular auctions, which can be at different intervals depending upon the security.

With the market volatility, some investors have raised questions about auction market securities. We address those questions in the next article.


**Merrill Lynch**
01 February 2008

The Fixed Income Digest

# Answering your questions about auction market securities

### Are Closed-End Fund preferred auction securities safe?

We consider CEF auction securities to be the conservative's conservative security. The fund and the fund manager must adhere to the provisions of the Investment Company Act of 1940.

- The fund is legally required to maintain the market value of the assets at a level equal to 200% of the face value of the auction market preferred. Typically, funds have asset coverage well above that threshold. Many funds maintain coverage levels at 300% or above. The preferred securities are the senior claim on the fund's assets.

- Under the regulations, funds are required to mark their assets to market every month. However, as a matter of good business practice, fund managers usually determine the market value either weekly or daily.

- If the fund is not able to meet the 200% asset coverage test, it must quickly remedy the situation. Historically, that has involved redeeming the security on the next auction date.

- Closed-end auction market preferreds have been around for 20 years. They have been through the S&L and banking crises of the late 1980s and early 1990s, the Asian contagion, and the 2002 accounting scandals.

### Can I be sure of getting my money back when I want it?

Auction market securities do not provide the daily access to funds that money market funds do, but we think that the higher rates compensate for the slightly lesser degree of liquidity. Except in the rare case of a failed auction (see below), investors who choose to do so can receive their principal back at the next regularly scheduled auction. Depending upon the security, the auctions can reset at intervals of one week, one month, 49-days, or one quarter.

### The rates on auction market securities seem too good to be true. What are we missing?

Rates on auction securities have been abnormally high in relation to other rates because of liquidity concerns, and in the case of some tax-exempt securities, concerns about the safety of the bond insurers. Liquidity concerns have been a common theme in the money markets since last summer.

We don't view the high spreads as a reason to worry. We are comfortable with the safety of auction securities from closed-end funds, and view the unusually high present level of rates as an opportunity rather than a cause for alarm.

### How likely is a default?

A default on an auction market security would mean that the security no longer pays interest or dividends. Defaults are even rarer than failed auctions. We are not aware of a default on an auction market security since the early 1990s. Given the high credit quality of the vast majority of the auction market, and the historical record, we believe a credit default on an auction market security is a very low probability.


**Merrill Lynch**
01 February 2008

The Fixed Income Digest

## What is a failed auction?

A failed auction is one where there are more sellers than buyers, so that not all sellers can receive par value back. A failed auction is NOT a default.

In the event of a fail the investor can either: 1) liquidate the securities in the secondary market, but at a lower price than par, or 2) hold onto the security through subsequent auctions until an auction clears, the legal final maturity date, or when the issue is called. For the investor who holds on, the issuer will continue to pay interest on the security at a pre-determined higher maximum rate, as described in the issuer's prospectus. The rate is usually based on a markup above a designated market index. That rate is usually higher than the rate that would have cleared at the auction, and provides an incentive for the issuer to call the security.

## How often do closed-end fund auctions fail?

Hardly ever. There was one failed auction on January 22, 2008. But that was an isolated event that involved only a small number of shares, and the next auction from that same closed-end fund was successful. Prior to the recent episode, the last failure that involved closed end fund securities held by individual investors was in 1990.

The auction failures in 1990 stemmed from the descent to insolvency of Drexel, Burnham, Lambert, who was the sole broker-dealer involved in the auctions. The fails lasted for several months until a new broker-dealer began supporting the auctions. Investors who held on did not lose money, as they received par value back when the auctions resumed with the new broker dealer.

## What about the auction market securities backed by monoline insurers?

Although we don't expect the AAA-rated insurers to fail, we believe it is prudent for investors to evaluate insured securities on the basis of the underlying rating without the insurance. Most of the municipal bonds that are part of the auction market have a rating of A- or higher, and the monoline insurers follow a "zero loss" policy in insuring bonds. The historical default rate on A-rated municipal bonds is 1% or lower.

## How do the relatively high auction market rate spreads the common shares of the closed-end funds?

Auction market rates have been higher than normal in relation to other rates, although the absolute level of rates has declined recently as the Fed has been cutting rates. To the extent that these rates remain high, they raise the costs of leverage for closed-end funds, and therefore hurt the earnings of the funds.

EXHIBIT B

# FAS 140: QSPE Status of Certain Securitizations

0

## Background

- Earlier this year, questions were raised by the auditing community regarding whether certain commercial mortgage backed securitization (CMBS) structures met all the criteria to be considered QSPEs under Statement No. 140
- The following provisions were questioned:
  - Waiver of "Due on Sale" provisions
  - Collateral Substitution
  - Length of Time before REO is sold

1

**Merrill Lynch**

**Description of Provisions**

- Waiver of "Due on Sale" Provisions
  - If an underlying property is sold, normally the loan would become due and payable on sale. This requirement may be waived by the servicer of the assets and the new borrower substituted for the existing borrower
- Collateral substitution
  - In certain multi-property loans, a borrower may elect to substitute one property for another, as long as certain conditions are met regarding the similarity of the underlying property
  - Servicer must approve such substitution
- REO
  - Tax REMIC rules permit a servicer to hold a property that is acquired via foreclosure for no longer than three years

2

**Issue/Status**

- Concern arose as to whether these provisions provide a servicer with too much discretion, or constitute new lending (not permissible for a QSPE)
- Big 4 and Industry Association (CMSA) met with FASB to discuss; no decisions reached
- Standard setters may elect to issue guidance on this issue – forum and outcome both uncertain

3

**Merrill Lynch**

# Classification of Auction Rate Securities

4

---

**Cash Equivalents – FAS 95 definition**

- Cash Equivalents are generally short-term, highly liquid investments that are both:
  - Readily convertible to known amounts of cash
  - So near their maturity that they present insignificant risk of changes in value because of changes in interest rates
- Typically, only investments with original maturities of 3-months or less qualify under this definition
  - US Treasuries, Fed Funds, etc.

5

**Merrill Lynch**

**Auction Rate Securities - Overview**

- Also referred to as Auction Rate Notes, Market Auction Preferred Stock and Money Market Preferred Stock.

- Auction rate securities usually have a long-term stated maturity but their interest or dividend rate is reset periodically (e.g., 7, 28 or 35 days) through a Dutch Auction conducted by a broker-dealer or other financial institution.

- The holder of the security does not have the right to put the security back to the issuer.

- Although these securities trade and price similar to other cash equivalents, they do not qualify as cash equivalents.
    - Long-term stated maturity does not meet strict criteria of FAS 95

6

**Resolution**

- SEC's Division of Corporate Finance confirmed guidance
    - As a result, more than ½ of corporate investors reclassed and many had to restate
- Bond Market Association approached FASB to reconsider this decision
- In October, the FASB met and decided not to add to its agenda at this time

7

**Merrill Lynch**

EXHIBIT C

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Frederick Burton, Individually<br>And On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>Merrill Lynch & Co., Inc. and Merrill Lynch,<br>Pierce, Fenner & Smith Inc.,<br><br>Defendants. | Case No. 1:08-cv-03037-LAP |
| Richard Stanton (as Trustee for Ashley<br>Stanton), On Behalf of All Others Similarly<br>Situated,<br><br>Plaintiff,<br><br>v.<br><br>Merrill Lynch & Co., Inc. and Merrill Lynch,<br>Pierce, Fenner & Smith Inc.,<br><br>Defendants. | Case No. 1:08-cv-03054-LAP |

## DECLARATION OF GERALD WENDEL IN SUPPORT OF THE MOTION OF GERALD WENDEL AND ROBERT BERZIN FOR APPOINTMENT AS LEAD PLAINTIFF AND APPROVAL OF SELECTION OF COUNSEL

I, Gerald Wendel, under penalty of perjury, hereby declare:

1.      I make this declaration in support of the motion to appoint Robert Berzin and me as Lead Plaintiff in this class action. This declaration is based on my personal knowledge. If called to testify to its contents, I could and would competently do so.

2.      I am the trustee of the MBJR Trust and have full authority to make investment decisions and to pursue legal action on its behalf. On behalf of the MBJR Trust, I purchased more than $40 million in auction rate securities from Merrill Lynch during the Class Period. Since the market for auction rate securities collapsed in February 2008, I have not been able to sell those securities.

3.      In May 2008, I authorized Girard Gibbs LLP and its co-counsel to move for my appointment as Lead Plaintiff with class member Robert Berzin. I am aware of the responsibilities of a Lead Plaintiff including monitoring the progress of the case and supervising the conduct of counsel. If the Court appoints us as Lead Plaintiff, I plan to work with Mr. Berzin to prosecute this action in the best interests of the class. I am also prepared to serve as Lead Plaintiff individually.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this _12_th day of June, 2008

_____
Gerald Wendel

1

EXHIBIT D

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| Frederick Burton, Individually<br>And On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>Merrill Lynch & Co., Inc. and Merrill Lynch,<br>Pierce, Fenner & Smith Inc.,<br><br>Defendants. | Case No. 1:08-cv-03037-LAP |
| Richard Stanton (as Trustee for Ashley<br>Stanton), On Behalf of All Others Similarly<br>Situated,<br><br>Plaintiff,<br><br>v.<br><br>Merrill Lynch & Co., Inc. and Merrill Lynch,<br>Pierce, Fenner & Smith Inc.,<br><br>Defendants. | Case No. 1:08-cv-03054-LAP |

## DECLARATION OF ROBERT BERZIN IN SUPPORT OF THE MOTION OF GERALD WENDEL AND ROBERT BERZIN FOR APPOINTMENT AS LEAD PLAINTIFF AND APPROVAL OF SELECTION OF COUNSEL

1

I, Robert Berzin, under penalty of perjury, hereby declare:

1.     Along with class member Gerald Wendel, I am one of the applicants for appointment as Lead Plaintiff in this class action. I make this declaration to supplement my prior certification filed in this case. This declaration is based on my personal knowledge. If called to testify to its contents, I could and would competently do so.

2.     My claims in this case are based on purchases of auction rate securities from Merrill Lynch by three of my closely-held companies, Industrial Construction Corp. ("Industrial Construction"), Winter Park Pines, Ltd. ("Winter Park"), and Colonial Bowling Lanes, Inc. ("Colonial Bowling").

3.     I am the President and sole shareholder and owner of Industrial Construction, which in turn is the General Partner of Winter Park. I am also the President and sole director of Colonial Bowling. I have full authority to act on behalf of all three companies, including the authority to make investment decisions and to bring or participate in a lawsuit under the federal securities laws.

4.     In May 2008, I authorized Girard Gibbs LLP and its co-counsel to ask the Court to appoint me and other qualified class members, whose auction rate securities are now frozen, as Lead Plaintiff in this class action. I am aware of my responsibilities to prosecute this class action jointly with the other applicant for Lead Plaintiff, Mr. Wendel. If we are appointed by the Court, I will work with Mr. Wendel to ensure that the case is prosecuted responsibly. I intend to monitor the litigation, supervise the performance of counsel, and represent the interests of the class.

2

I, Robert Berzin, under penalty of perjury, hereby declare:

1.    Along with class member Gerald Wendel, I am one of the applicants for appointment as Lead Plaintiff in this class action. I make this declaration to supplement my prior certification filed in this case. This declaration is based on my personal knowledge. If called to testify to its contents, I could and would competently do so.

2.    My claims in this case are based on purchases of auction rate securities from Merrill Lynch by three of my closely-held companies, Industrial Construction Corp. ("Industrial Construction"), Winter Park Pines, Ltd. ("Winter Park"), and Colonial Bowling Lanes, Inc. ("Colonial Bowling").

3.    I am the President and sole shareholder and owner of Industrial Construction, which in turn is the General Partner of Winter Park. I am also the President and sole director of Colonial Bowling. I have full authority to act on behalf of all three companies, including the authority to make investment decisions and to bring or participate in a lawsuit under the federal securities laws.

4.    In May 2008, I authorized Girard Gibbs LLP and its co-counsel to ask the Court to appoint me and other qualified class members, whose auction rate securities are now frozen, as Lead Plaintiff in this class action. I am aware of my responsibilities to prosecute this class action jointly with the other applicant for Lead Plaintiff, Mr. Wendel. If we are appointed by the Court, I will work with Mr. Wendel to ensure that the case is prosecuted responsibly. I intend to monitor the litigation, supervise the performance of counsel, and represent the interests of the class.

2

I declare under penalty of perjury that the foregoing is true and correct.

Executed this $\lfloor 3$ th day of June, 2008

Robert Berzin

3

EXHIBIT E

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 7/31/07

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———— ———— ———— ———— ———— ———— x

NARAIN BHOJWANI, individually and
on behalf of all others similarly situated,

        Plaintiff,                        06 Civ. 13761 (CM)(KNF)

      -against-

EVANGELOS J. PISTIOLIS, STAMATIOS N.
TSANTANIS and TOP TANKERS, INC.,

        Defendants.

———— ———— ———— ———— ———— ———— x

              MEMORANDUM DECISION AND ORDER ACCEPTING THE
              RECOMMENDATION OF THE HON. KEVIN N. FOX,
              U.S.M.J., TO CONSOLIDATE THE TEN ABOVE-CAPTIONED
              ACTIONS AND REJECTING THE RECOMMENDATION OF THE
              HON. KEVIN N. FOX CONCERNING LEAD PLAINTIFF/LEAD
              COUNSEL APPOINTMENTS, AND INSTEAD APPOINTING
              JOSEPH A. DESHAYES, JR., AS LEAD PLAINTIFF
              IN THE TEN CONSOLIDATED ACTIONS

McMahon, J.:

## Motion for Lead Plaintiff/Lead Counsel

These ten actions were recently reassigned to this court from the docket of the late Judge
Richard Conway Casey. Judge Casey had previously referred the matter to The Hon. Kevin
Nathaniel Fox, U.S.M.J., for a report and recommendation on the eight competing motions for
lead plaintiff/lead counsel status in this action brought pursuant to the Private Securities
Litigation Reform Act (PSLRA), 15 U.S.C. §78u-4(a)(3)(B). The learned Magistrate Judge
issued his report on June 26, 2007. He recommended that (1) the ten actions be consolidated,
with all relevant filings maintained as one filed under Docket No. 06 Civ. 13761, together with
any other actions, pending or subsequently filed, arising out of or relating to the same facts
alleged in the above-captioned actions; and that (2) Jerry Burns be appointed lead plaintiff and
Lerach Coughlin Stoia Geller Rudman & Robbins LLP be appointed lead counsel.

Two objections were timely filed: by putative Lead Plaintiffs Bryant Holdings LLC

Shareholder Group and Joseph A. DeShayes, Jr.

The Court (1) accepts the Report; (2) accepts the recommendation (which is not opposed by any party) to consolidate these ten identical class actions; (3) rejects the recommendation that Jerry Burns and Lerach Coughlin be appointed Lead Plaintiff and Lead Counsel, respectively; (5) overrules the objection of putative Lead Plaintiff Byant Holdings Shareholder Group, and (6) sustains the recommendation of putative Lead Plaintiff Joseph A. DeShayes, Jr. and appoints Joseph A. DeShayes, Jr. as Lead Plaintiff and Schiffrin Barroway Topaz & Kessler, LLP and Labaton Sucharow & Rudoff LLP as Lead and Liaison Counsel, respectively.

The decision on this motion should have been rendered some months ago. Notice of this class action was filed on December 11, 2006. The various motions for lead plaintiff status were made on or before February 9, 2007, within the 60 day period following publication of the December 11 notice.

Judge Casey's untimely demise resulted in an administrative logjam for some months, so I can well understand why this motion does not reach my desk until now. Rather than waste still more time writing a lengthy opinion, I adopt Judge Fox's thorough description of the Background set forth at pages 2 through 8 of the Report. I adopt his manifestly correct discussion of the issue of consolidation as the opinion of the Court (Report, pages 8 through 10), and I order these actions consolidated for all purposes. Likewise, I adopt his discussion of the PSLRA standard for appointment of lead plaintiff and lead counsel (Report, page 10).

I see nothing erroneous in the learned Magistrate Judge's discussion of the leeriness with which courts in this circuit (including this one) approach the issue of aggregating individual investors not associated with each other except through their participation in a securities class action lawsuit into so-called lead plaintiff "groups." In general, courts are – and ought to be – reluctant to aggregate a group comprised of disparate and apparently unrelated plaintiffs (see cases cited at Report, page 11), especially when such an unnatural aggregation would supplant an institutional investor as lead plaintiff. However, when it is appropriate to do so, courts have permitted aggregations of unrelated investors to proceed as lead plaintiffs in litigation governed by the PSLRA; indeed, the statute itself expressly permits a "group of persons" to serve as lead plaintiff. In deciding whether aggregation is appropriate, courts consider factors such as the size of the group, whether the group was formed in bad faith, and the relationship among the members of the group.

Judge Fox declined to consider appointing any aggregated groups as lead plaintiffs – as the DeShayes objection put it, he adopted a bright-line rule against aggregated group plaintiffs. Were there an instituional investor with significant holdings that was appropriately situated to assume the prosecution of this case, I might well agree with the learned Magistrate; I have so concluded on at least one prior occasion. However, I respectfully disagree with the learned Magistrate Judge's approach in this particular case, where the alternative is not a significant institutional investor.

2

Allowing for aggregation, the two largest putative lead plaintiffs in terms of financial interest are Bryant Holdings and DeShayes. Their respective losses ($1.1 million for Bryant Holdings and $677,073 for DeShayes) dwarf the losses of any of the other putative lead plaintiffs. In particular, they dwarf the holdings of Jerry Burns, who suffered only $75,967.04 in losses after taking account of dividends paid during the class period. Burns came in sixth out of the eight moving putative lead plaintiffs. He is not the most appropriate lead plaintiff, and I decline to adopt the Magistrate Judge's recommendation that he be so appointed.

The question, then, is which of the two remaining competitors will be named lead plaintiff.

The learned Magistrate Judge refused to aggregate the holdings of Mr. DeShayes and various members of his family and his family's business; he looked only to the losses suffered by Mr. DeShayes personally. This was clear error. The record reveals that Mr. DeShayes made all investment decisions relating to Top Tankers on behalf of all the members of his family, including his son's business, and that he had unrestricted decision-making authority over all of the DeShayes Family Accounts. The Magistrate Judge's finding that Mr. DeShayes offered "no proof" that he was authorized to move for lead plaintiff designation on behalf of his family is clearly erroneous, since the various members of the DeShayes family made it clear, in affidavits filed with the court, that Mr. DeShayes had authority to act on their behalf in this matter. Moreover, those affidavits are highly credible. The members of the DeShayes Family Group are not unrelated parties who came together for the sole purpose of trying to become lead plaintiffs in these lawsuits. They are a man, his wife, his daughter, his son-in-law, and the business owned by his son. The number in the group is small; the relationship among the members is the closest and most natural imaginable; and the nature of the relationship among the group members makes it highly improbable (if not impossible) to conclude that the group was formed in bad faith by an attorney trying to conduct the sort of lawyer-driven litigation that the PSLRA was passed to eliminate.

Finally, the attorneys selected by Mr. DeShayes - the firm of Schiffrin Barroway Topaz & Kessler, LLP – are outstanding in their field and have ample experience as lead counsel, co-lead counsel and executive committee member counsel in numerous complex securities fraud cases. Proposed liaison counsel, Labaton Sucharow & Rudoff LLP, are equally experienced and well known to this court.

I thus conclude that Joseph A. DeShayes, Jr., would make an appropriate lead plaintiff and that his counsel would serve well as lead counsel. The only question, then, is whether the DeShayes Family Group has managed to rebut the presumption that the Bryant Holdings Group – whose projected losses as submitted to the court are one third again as great as the DeShayes Family Group's losses   is the most suitable plaintiff. I conclude that it has.

Bryant Holdings is a two-member group. Although named for Bryant Holdings LLC, a limited liability corporation with two principals, it is the other member of the group – Fred Cole

3

– who suffered the lion's share of the losses. Indeed, of all the individuals and entities who associated themselves with these motions, Mr. Cole suffered the largest individual loss – more than $1 million – and easily could have moved for lead plaintiff status on his own, without joining any group. But Mr. Cole did not timely (i.e., by February 9, 2007) move for lead plaintiff status on his own. My review of the record reveals that he first indicated his willingness to serve as sole lead plaintiff in an affidavit signed on February 23 and filed with this court on March 2. Prior to that time, he only expressed an interest in moving for lead plaintiff status in conjunction with Bryant Holdings LLC.

It does not appear from the motion papers that Mr. Cole has any relationship with Bryant Holdings LLC independent of this lawsuit and lead plaintiff application. Indeed, from the repetition of the mantra that Bryant Holdings Group is a "small, cohesive, manageable two member group," which appears throughout the Bryant Holdings Group's moving papers, I gather that Mr. Cole is not the second member (besides Mr. Bryant) of Bryant Holdings LLC, and that he (unlike the members of the DeShayes family) has no prior association with Mr. Bryant's business. None of the papers submitted by the Bryant Holdings Group explains how these two disparate entities agreed to work together to prosecute this lawsuit; for all this court knows, Bryant Holdings and Mr. Cole never encountered each other prior to the formation of their litigation "partnership."

I accept Mr. Cole's representation that he has never been involved in any criminal case and that he is not any of the various persons of the same name with criminal pasts who are alluded to in the affidavits of other putative lead plaintiffs. However, in view of the fact that Mr. Cole would appear to be a practically perfect lead plaintiff, the insignificance of what Bryant Group brings to the table in terms of holdings, and the paucity of information about how and why they came together, I am left with the firm conviction that the Bryant Holdings Group is a "lawyer driven" plaintiff engineered for the sole purpose of maintaining this lawsuit and attaining lead plaintiff status therein.

Both DeShayes and Defendants have raised significant questions about the data submitted to prove the holdings of Mr. Cole. Initially, the Bryant Holdings Group claimed losses in excess of $1.123 million. As Magistrate Judge Fox observed, a "corrected" motion was quickly filed, to account for certain "wash" sales, altering the loss realized by the group to $1.2 million.[1] Mr. Cole provided back up statements from his broker (Fidelity) for six of his eight accounts. In reply papers responding to attacks on the validity of his data by Defendants and DeShayes, he included what was described as "corroborative backup data" for the Fidelity statements. In a surreply brief, Mr.

---

[1] Because this arithmetic correction was made to account for certain "wash sales" that were not correctly accounted for in the initial motion (and was made on the next business day following the submission of the original motion), and not to add additional transactions, I do not view this as falling within the rule of In re Specialists Sec. Litig., 240 F.R.D. 128, 138 (S.D.N.Y. 2007), and I deem the corrected papers to be the motion papers filed on behalf of Bryant Holdings Group. I therefore do not join in footnote 2 of Magistrate Judge Fox's Report.

4

DeShayes identified additional discrepancies, this time between the data derived from the Fidelity statements and the "corroborative backup data." The amount of these discrepancies, while not de minimis, is small relative to Mr. Cole's total holdings. If I eliminated all of the allegedly discrepant transactions, Mr. Cole would still have the largest paper loss of any of the named plaintiffs. However, the fact that the data still do not quite add up indicates a certain carelessness about detail that undermines the adequacy of Mr. Cole (and his associated group) as a lead plaintiff.

Finally, the court questions the adequacy of the Fox Gauthier Law Firm to serve as lead counsel, in view of what appear to be, at best, inflated statements about the firm's role in the In re Merck, Inc. Securities, Derivative and ERISA Litigation, MDL Docket No. 1658 (D.N.J.), and about the allegedly "instrumental" role of Kahn Gauthier partner Michael A. Swick (a former associate in the Milberg Weiss Firm) in the In re Oxford Health Plans, Inc., Securities Ligitation, MDL Docket No. 1222 (CLB)(S.D.N.Y. ).

In short, after careful consideration, I find that Joseph DeShayes is best suited to serve as lead plaintiff in this action, and that his designated counsel – Schiffrin Barroway Topaz & Kessler, LLP and Labaton Sucharow & Rudoff LLP – are best suited to serve as lead counsel and liaison counsel, respectively. I so appoint them.

The consolidated cases should go forward under the heading "In re Top Tankers, Inc. Securities Litigation," using the lowest docket number (06 Civ. 13761).

## Scheduling Order

Rather than have counsel stipulate to a leisurely schedule leading up to class certification briefing, let me impose one more to my liking. If an amended complaint is to be filed, it must be filed no later than August 17, 2007. Any motion to dismiss addressed to whatever complaint is operative must be filed by September 20 (a date longer than I would have given but for the occurrence of Rosh Hashanah during the week of September 10). Responses to the motion to dismiss are due October 12, and the reply October 19. Mr. DeShayes must be deposed on issues relevant to his ability to serve as an adequate class representative prior to November 9, 2007. THESE DATES WILL NOT BE EXTENDED FOR ANY REASON.

In briefing any Telltabs issues on the motion to dismiss, defendants are reminded that they must suggest competing inferences that might be drawn from the facts pleaded in the complaint (assuming them to be true) and explain why those inferences are at least as compelling as the inferences plaintiff proffers.

Dated: July 30, 2007

_____ _____ _____ _____ _____ _____
U.S.D.J.

BY HAND TO MAGISTRATE JUDGE K.N. FOX

6